HENRY BROWN, ET AL. *v.* TRUSTEES OF M. E. CHURCH, ETC.

[No. 15, October Term, 1942.]

*Decided October 29, 1942.*

The cause was argued before BOND, C. J., SLOAN, JOHNSON, DELAPLAINE, FORSYTHE, MARBURY, and GRASON, JJ.

*G. Elbert Marshall* for the appellants.

*Herbert E. Perkins* for the appellees.

JOHNSON, J., delivered the opinion of the Court.

This is an appeal from a declaratory decree of the Circuit Court for Kent County, construing the codicil and will of Ruth Anna Cahall, the former executed December 1, 1927, and the latter executed March 11, 1931. Ruth Anna Cahall died February 14, 1933. The portions of the instruments sought to be construed are as follows:

Home (1)        "To Jacob F. Thompson and his wife Nettie I bequeath the property where I now live to be held by them during their natural lives.

Dbl. Dw. (1)        "I will that my executor take charge of the double dwelling next door to my home, pay insurance, taxes, make all necessary repairs, and improvements and pay the remainder of the income annually to my brother Quinton Moody. He shall take from my estate, five hundred dollars, for improvements, or other expenses.

Dbl. Dw. (2)        At the death of my brother Quinton Moody, the proceeds of the double dwelling shall be paid to the trustees of the Methodist Episcopal Church in Chestertown to be held as a rebuilding fund, for no other purpose. * * *

Home (2)      "At the death of Jacob F. Thompson and his wife Nettie, I will that the pro- ceeds of the home where I now live be used for the following purposes, To Bond and Mowbray Chapel, each five hundred dollars, two thousand to the Emergency Hospital at Easton, Md. Two thousand dollars to the Red Cross, and the remainder to be held in trust to assist in establishing a Home for the aged in Chestertown, Maryland."

"Codicil

Dbl. Dw. (1C)    "As my brother T. Q. Moody has passed away all of his claim in my estate becomes paid and I bequeath to Jacob F. Thompson and his wife Nettie the double

Dbl. Dw. (2C)    dwelling next door to my home, while they live, at their death, I will it to be divided in the following manner, to the Volunteer Fire Company of Chestertown eight hundred dollars, to a home for the aged, and a hospital for Chestertown each five hundred dollars.

"The remainder of the proceeds I bequeath to the trustees of the Methodist Episcopal Church, in Chestertown to assist in paying for the remodeling the

Home (C)    church but my home to he held in trust to be used for a rebuilding fund for the said church to be used for no other purpose whatever."

(1) is used to indicate life tenancies; (2) is used to indicate remainders; (C) indicates codicil provisions. The shorthand terms used in the left margin facilitate discussion of the provisions.

The trustees of the M. E. Church in Chestertown, Jacob Thompson as surviving executor of the will and testament, and Jacob Thompson and Nettie Thompson,

individually, joined in a bill of complaint praying construction of the will and codicil as respects three questions:

(a) Whether Home (C) revokes Home (2);

(b) Whether Home (C) revokes Home (2) and Home (1);

(c) Whether Dbl. Dw. (2C) revokes Dbl. Dw. (2).

Joined as respondents were the trustees of Bond Chapel, trustees of Mowbray Chapel, Kent and Queen Anne's County Hospital, Emergency Hospital of Easton, Maryland, the American Red Cross, and the Volunteer Fire Company of Chestertown, Maryland; these respondents filed various answers and demurrers. On January 22, 1942, the petition was amended to show a deed dated November 5, 1941, by which Jacob Thompson and his wife Nettie purported to quitclaim to the trustees of M. E. Church of Chestertown all their interest in certain property which was evidently the "home" property of the testatrix. The propriety of the plaintiffs as parties having been raised by pleadings of respondents, the chancellor decreed that the life tenants and executor were proper parties, and further decreed that the final clause of the codicil Home (C) revoked not only Home (2) but also Home (1). The plaintiffs' third question was evidently also answered in the affirmative.

The appellants raise seven questions in their brief:

(1) Do the facts alleged constitute a proper case for declaratory relief?

(2) Is the suit prematurely brought?

(3) Since the suit is premature, are the Thompsons proper parties?

(4) Does the Orphans' Court jurisdiction prevail over that of equity?

(5) Do the executors have authority, under the will and codicil, to sell the home or double dwelling?

(6) Does Home (C) revoke Home (2)?

(7) Does Home (C) revoke Home (2) and Home (1)?

It seems thus not to be seriously contended that Dbl. Dw. (2C) does not revoke Dbl. Dw. (2); the codicil

distribution of the proceeds of the double dwelling seems complete and thus revokes by repugnancy the will distribution of those proceeds. The only substantive question remaining is thus the effect of the clause designated Home (C), "but my home to be held in trust to be used for a rebuilding fund for the said church. * * *." It is obvious that there are three possible interpretations of the effect of this provision:

1. It revokes nothing, but the final bequest of Home (2), because it merely refers to the "remainder of the proceeds" of the home, the quoted phrase being implied from the preceding clause. (The appellants take this position.)

2. It revokes Home (2) entirely but has no effect on Home (1), because it refers to "proceeds" of the home, by implication, has no reference or repugnancy to Home (1), and is thus to be effective at the termination of the Thompsons' life tenancy.

3. It revokes Home (2) and it revokes Home (1), because, no future time being mentioned, and the words being clear in the present tense, the home is "to be held in trust" from the effective date of the will and this is inconsistent with Home (2) and Home (1). (The chancellor took this position.)

Propriety of the suit, jurisdiction, and propriety of the plaintiffs as parties, may now be briefly considered. Article 31A of the Maryland Code, 1939, ought to be construed as intended to have been an enactment of the Law of Declaratory Judgments as the Uniform Act was generally construed at the time of its adoption by our Legislature; the words of the Act itself urge uniform construction of its provisions. It is true, however, that equitable construction of wills is ancient law and practice, when "special circumstances" appear, and the decisions of our court before the adoption of the Uniform Act are by no means lacking now in authority. The principles of declaratory relief will be found substantially the same under the Act of 1939, Chap. 294, as under the Act of 1888, Chap. 478, Code, 1939, Art. 16, Sec. 29.

Appellants argue that there is no case made for declaratory relief, particularly in view of the frequent pronouncements that "great care and jealousy ought be exercised in its application," since there is a rational reconciliation of will and codicil. The seeming breadth of Sections 2 and 4 (a) and (b) is reduced by application of the settled principles that there must be an "actual, genuine, live controversy" "sufficient to admit of a conclusive adjudication"; that is, the qualities of justiciability must be present before there is a proper case for declaratory decree. It must be true that the declaration sought will be of practical help in ending the controversy. Where these elements are present, the tendency ought to be to grant the relief, for its purpose and justification are utility. In *Saunders v. Roland Park Co.*, 1938, 174 Md. 188, 193, 198 A. 269, 270 (though non-joinder was the defect considered) we have said:

"It has been left to the courts to study the usefulness of a decree and the justice and convenience of its effects in each particular instance, and to govern their action according to their resulting judgment."

Is there a "controversy" here so "actual, genuine and live" as to warrant construction of the instrument? As to whether the Home (2) bequests to charities are revoked by Home (C) it seems clear that there is—petitioners say they were revoked; respondents say they were not; what each will take will directly depend on settlement of that question. As to whether the life tenancy of the Thompsons in the Home (1) was revoked by Home (C) it seems doubtful—if it was revoked, petitioners (M. E. Church) take the home in fee; if it was not revoked, they take it by virtue of the quitclaim deed from the Thompsons. The only reason respondents contend that it was not revoked is that it is inconceivable that it be revoked and the bequests to them, Home (2), at the same time remain valid; the only reason petitioners contend that it was revoked is that such a holding would almost surely lead to the denial of the respondent's position as to Home (2). Thus, the claims of

both are only for argumentative purposes, not for direct benefit from a holding in their favor. Though conceivable that some agreement between the petitioning M. E. Church and the petitioning Thompsons, individually, would be directly affected by the holding, such is not shown. However, declaratory relief may be granted at the solicitation of a justifiably perplexed and confounded personal representative, or on the principle that relief will sometimes be given incidentally when it alone might not be had. See *Borchard, Declaratory Judgments,* on former rule. There seems to be no harm herein deciding the question as to the life tenancy, provided there is no other overruling objection to granting the relief sought.

Appellants' objection that the suit is premature is grounded on the well-recognized rule that equity will not "declare the rights of parties upon a state of facts which has not yet arisen, nor upon a matter which is future, contingent and uncertain." *Wahl v. Brewer,* 1894, 80 Md. 237, 243, 30 A. 654, 655; *Borchard, Declaratory Judgments,* 2d Ed., p. 56. It is stated in the Wahl case and clearly illustrated by its facts that the reason for this rule is that, within its meaning, the requisite of conclusiveness will not attach to the adjudication, because the proper parties cannot be known. This is further illustrated by modern holdings that vested remaindermen are proper parties and their interest is subject to adjudication by declaratory decree. *Borchard, Declaratory Judgments,* 2d Ed., pp. 411, 413.

The objection of prematurity is, of course, relevant only to the controversy concerning whether Home (C) revokes Home (2); that is, concerning the proper distribution of the proceeds of the home after the Thompsons' life enjoyment. This perhaps adds further explanation to the purpose of the appellants' "argumentative argument" that the Thompsons will enjoy the life estate; it is only that position which gives the prematurity argument any standing. But since the propriety of the declaratory decree must, in our opinion, rest upon its propriety in settlement of the controversy concerning the

Home (2) bequests, the prematurity objection deserves further consideration. It is, of course, true that neither respondents nor petitioners will, on this score, be affected by the executor's distribution until the Thompsons die, and to that sense the matter is "future." However, resorting to the purpose of the rule, it is plain that the parties in the future will be the parties now before us, and that the parties now before us are of age and are competent to argue their right; in short, adjudication now will be conclusive and binding. For this reason, the prematurity objection seems without merit in view of the interest in settling the matter for personal representative's benefit early in his administration of the estate.

In view of the above discussion concerning incidental relief and the purpose of the prematurity rule, it seems clear that there was no prejudicial harm in making the Thompsons, individually, petitioning parties. It is desirable that the executor be joined always in construction of a will. Additional parties are seldom prejudicially so made in a declaratory decree case.

Appellant's objection that the Orphans' Court is the proper tribunal for distribution of estates and thus equity should not take jurisdiction here finds little support in the cases. It is true that the Orphans' Court has jurisdiction, but holding that it acted properly is not equivalent to holding that equity cannot or should not, in a properly brought suit for declaratory relief, make a declaratory decree. Such a decree is not an administration or distribution of the estate; its purpose is to advise the executor, or any interested party, of his rights, by construction of the instrument. The eminent authority on Declaratory Judgments, Borchard, states, and we have held, that declarative relief is not a substitute or alternative to relief by a special tribunal set up for the purpose of handling the matter in question. But that the Orphans' Court is such a "special tribunal" seems a novel suggestion. Nor is its existence sufficiently persuasive that a rule of discretion be invoked, when to do

so would defeat the broad purposes of the Uniform Declaratory Judgments Act. *Borchard, Declaratory Judgments,* 2d Ed., pp. 248-250. It seems by implication that the executors have authority to sell the property under the will.

It follows, then, that this is now a proper case for declaratory decree, and that the question of the Thompsons' life interest might be incidentally decided, and that the parties are not improper. We next come to consider the effect of codicil provision Home (C) upon will provisions Home (2) and Home (1).

The codicil was drawn because of the death of T. Q. Moody, and it clearly substitutes the Thompsons in place of Moody as life tenant of the double dwelling. The subsequent necessity for some change in Dbl. Dw. (2) provisions naturally occurred to the lay mind, *i. e.,* the life enjoyment of the double dwelling being changed, the time of enjoyment of the remainder must be changed. So the testatrix changed it, but, having the Chestertown charities [Dbl. Dw. (2C)] much in mind at the time, she changed also the beneficiaries of the proceeds of the double dwelling. This being a complete disposition, it revoked the "rebuilding fund" bequest of Dbl. Dw. (2). Then, evidently realizing that she had destroyed her "rebuilding fund," the testatrix wrote the provision, the effect of which is the subject of the present controversy, *i. e.,* "but my home to be held in trust to be used for a rebuilding fund for the said church to be used for no other purpose whatever."

Appellants contend that this provision has the limited effect of revoking only the final bequest of Home (2), which leaves the remainder of the proceeds (after $5,000 of bequests have been paid) to the Chestertown Home for the Aged. They reason that "remainder of the proceeds" should be implied in the quoted provision. Appellees argue that it at least revokes the entire paragraph disposing of the proceeds of the home [Paragraph Home (2)], reasoning that it refers to the "proceeds" of the home and means the entire proceeds, though it

have no reference to the life tenancy, and is thus not repugnant to it. Appellees' full argument takes the third position; that is, that the quoted provision takes effect on the death of the testatrix, and that it thus revokes the entire paragraph disposing of the home proceeds, and also the paragraph creating the Thompson life tenancy.

The last will be considered first. When the testatrix wrote the provision in question, she was writing a sentence which referred to disposition of the double dwelling proceeds after sale. The will clearly contemplated sale of the home also. Moreover, the placement of the two will paragraphs concerning disposition of the home, as well as her language throughout, will and codicil, indicates that the testatrix made clear mental distinctions between dispositions during the life of persons and after their death. It is, of course, true that no distinction is mentioned expressly in the clause and it might be argued on this basis that no distinction was intended and that the rebuilding trust was to begin immediately on her death, and revoke the life tenancy.

The chancellor, in decreeing that the life tenancy was revoked, must have pictured testatrix as reasoning that life estate in the double dwelling was enough life estate for the Thompsons and that that life estate was intended to supplant the one created by the will in the home property.

From an examination of the entire will and the codicil it seems that the testatrix intended to substitute the one piece of property given to the Thompsons for the other and without any expression on her part of a desire to postpone the enjoyment or use of it by the church. It cannot be said that the codicil had merely the effect of changing the remainder interest therein. For this reason we agree with the chancellor and must affirm the decree appealed from.

*Decree affirmed, with costs.*